UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

KIMBERLY WYSONG,

   Plaintiff,       Case No. C2-04-CV-07
               JUDGE GREGORY L. FROST
  v.           Magistrate Judge Abel

DOW CHEMICAL CO.,

   Defendant.

## OPINION & ORDER

Defendant Dow Chemical Co. ("Dow") filed a motion for summary judgement (Doc. # 33), to which Plaintiff Kimberly Wysong ("Wysong") responded (Doc. #34).  Dow filed a reply (Doc. # 35), and the matter is now ripe for consideration.

## BACKGROUND

In 2000, Dow, a Delaware Corporation, hired Wysong, an Ohio resident, as an operating technician at Dow's Hanging Rock, Ohio facility.  (Wysong Dep. 48-50).  Wysong's job responsibilities included making polyethylene foam products.  *Id.* at 85-88. To that end, her job was physically demanding, as she had to place raw material into a laminating machine.  *Id.*  The raw material arrived in Wysong's work area on pallets from the warehouse, and she was sometimes required to use a forklift to load the laminator.  *Id.*  The laminator has moving parts and therefore has the capacity to be dangerous.  *Id.*

Plaintiff suffered from a variety of ailments during her employment with Dow.  *Id.* at 93; Doc. # 34 at 1-2.  For example, in 2000, Wysong began experiencing neck pain and sought treatment from Dr. Jones.  (Jones Dep. 13-20).  During her tenure with Dow, Wysong also saw

1

Dr. Golding, Dr. Briggs, and physical therapist Susan Martin to deal with her neck pain. (Jones Dep. 20-21, 33-39; Jones Dep. Ex. 8-10, Wysong Dep. 169-70). Additionally, she took 464 hours of FMLA leave in 2001, and 783 hours of such leave in 2002, due to various illnesses and to care for a sick child. (Wysong Dep. at 107-111, 152-53, 162-64; Hutson Dep. 22-23; Miller Dep. 22-30). It is her health during 2003 that is at issue here.

Dwight Miller ("Miller") was Wysong's supervisor. Miller met with Wysong on February 7, 2003 and discussed concerns he had regarding her absences and her work performance. (Wysong Dep. Ex. 22). At that meeting, Miller informed Wysong that she had exhausted all of her paid medical leave time, and that if she need to take additional leave before she had accrued more, she would have to use vacation time or take lave without pay. (Wysong Dep. 154-55; Wysong Dep. Ex. 20). Shortly after that meeting, on February 15, 2003, Wysong missed a day and a half of work because of neck and shoulder problems. (Doc. # 34 at 2; Wysong Dep. Ex. 22). She did not get permission from Miller before taking that time off.

As a result, Miller and Tom Hutson ("Hutson"), Dow's Human Resources Business Partner, met with Wysong on February 17, 2003. (Wysong Dep. Ex. 22). Miller reiterated that any time Wysong took off would be counted as vacation; that once she had exhausted her vacation, any time off would be without pay; and reminded Wysong that she had to get his permission before taking any time off. *Id.* To memorialize this meeting, Miller prepared a "last chance letter that detailed their discussion. *Id.* Both Miller and Wysong signed the letter. *Id.*

The meeting seemed to serve its purpose, as Wysong did not miss any work between February 17, 2003 and May 14, 2003. (Wysong Dep. 104). However, after a tough shift in early May, she notified the plant's nurse, Janet Jones ("Jones"), that her neck was bothering her.

(Doc. # 1 at ¶ 8; Doc. # 33 at 8; Doc. # 34 at 2). Jones, following company protocol, reported Wysong's comments to the plant's Environmental Health and safety Director, Troy Dehoff ("Dehoff"). Dehoff, in turn, informed Miller, who contacted Dr. Teter ("Teter"), Dow's regional medical director. (Miller Dep. 40-44). Miller was concerned that Wysong would aggravate her neck while working. *Id.* Based on his knowledge of Wysong's history of neck problems, his conversation with the nursing department, and his review of the medical documentation in Wysong's file, Teter imposed work restrictions on Wysong on May 14, 2003. (Teter Dep. 23-27, 30-31, 35-37). Specifically, the restrictions prevented Wysong from lifting, pushing, moving, tugging, and pulling anything more than five (5) pounds. (Doc. # 34 at 3). Teter imposed the restrictions to prevent Wysong from injuring herself on the job. (Teter Dep. 30).

Teter informed Miller about the restrictions, and Miller determined that Wysong could not perform her job as long as the restrictions were in place. (Miller Dep. 38-39, 44-45). As such, Miller informed Wysong that Dow could not accommodate the restrictions, and told her not to return to work until the situation with her neck was resolved. *Id*; Wysong Dep. 156.

Upon learning from Miller that Wysong could not return to work until her neck was taken care of, Huston scheduled a medical review board. (Hutson Dep. 27-31). On May 15, 2003, Dow sent Wysong a letter, indicating that she only had three (3) more days of FMLA leave left for the year because she had previously exhausted the rest of her leave for that year. (Teter Dep. Ex. 22). The letter also notified Wysong about the medical review board hearing. *Id.* Hutson later placed Wysong on medical leave. (Hutson Dep. 40-41). On May 20, 2003, Wysong executed a medical release form so that Dow could obtain her records. (Teter Dep. 95; Teter Dep. Ex. 11).

3

On May 22, 2003, Hutson, Teter, Miller, Dow's in-house attorney, and Dow's diversity representative conducted the medical review board. (Doc. # 33 at 9). Those individuals concluded that Dow would give Wysong time to medically improve, but that Wysong would be required to complete a Functional Capacity Examination ("FCE") before she returned to work in order for Dow to be sure that she could perform her job in a safe manner. (Miller Dep. 46-48; Hutson Dep. 35-36; Teter Dep. 58).

The FCE is used to determine whether an individual is physically capable of completing a specific set of duties. A physical or occupational therapist administers a series of tests to the individual which are designed to mimic the individual's work responsibilities. *Id.* Wysong understood the nature of the test, and initially agreed to submit to one. (Wysong Dep. 135, 138-39).

Wysong took numerous prescription medications while she worked for Dow. Specifically, Wysong's doctors prescribed pain medications (Perocet, Darvaset, Elavitl, Neurontin); muscle relaxers (Zanaflex, Robaxin, Valium, Stelazine); an anxiety reliever (Zanax); an anti-depressant (Celexa); and the anti-inflamatory Celebrex (Wysong Dep. 80-82, 164-65, 172-73; Jones Dep. 20, 71-73). During his review of Wysong's medical file, Teter saw that Golding's notes indicated that she believed that Wysong was exhibiting signs of "drug dependency behavior" towards the prescription pain killers. (Teter Dep. 49-50, 100).

Teter became concerned that Wysong's use of pain killers while working with heavy equipment posed a serious safety issue. *Id.* at 48-49, 57-59, 68-69. Moreover, Teter felt if Wysong took the FCE when she was on the medications, the FCE results would be invalid. *Id.* Teter stated that if a person is taking pain killers during the FCE, their pain is masked, which

4

would allow them to work through pain and lead to further injury.  *Id.* at 102-04; Jones Dep. 56, 58, 62.  Consequently, Teter informed Wysong through Jones that Dow required Wysong to stop taking her medications for two weeks prior to the FCE.  (Wysong Dep. 139-41; Teter Dep. 60-61).  Wysong refused, so she did not take the FCE.  (Wysong Dep. 145, 176-77).

Hutson informed Wysong via letter on June 23, 2003 that Dow was placing her on unpaid medical leave as of July 7, 2003, pending a release to return to work by her treating physician and Dow's medical department.  (Wysong Dep. 150; Wysong Dep. Ex. 36; Hutson Dep. 64-67).  The leave was unpaid because she had no paid leave left, and because she would not stop taking her medications in order to complete the FCE.  (Hutson Dep. 72-73).  Huston also informed Wysong that she was required to keep Dow updated on her medical status so that she could remain on medical leave.  (Wysong Dep. Ex. 36; Hutson Dep. 67-68).

Wysong remained on medical leave until December 3, 2003.  (Wysong Dep. 133, 152).  At that time, Dow sent Wysong a letter that administratively terminated her pursuant to a company policy that requires the termination of any employee who is on a continuous leave of absence of more than six (6) months for a non-work related injury.  (Hutson Dep. 79-83; Wysong Dep. 178; Miller Dep. 72).  Further, the letter informed Wysong that Dow would reconsider its position if she provided information to support her argument that she could return to work in the immediate future.  (Wysong Dep. Ex. 41).  Wysong never contacted Dow, and instead filed this lawsuit.

Wysong's Complaint alleges that Dow violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*., by  terminating her in retaliation for her taking FMLA leave in 2001 and 2002, and by forcing her to use FMLA leave in May 2003.  (Doc. # 1 at ¶ ¶ 23,

24). Moreover, Wysong claims that Dow regarded her as being disabled and discriminated against her on that basis in violation of Ohio Rev. Code Chapter 4112, Ohio's disability statute. Id. at ¶¶ 27-32. Lastly, Wysong asserts a claim for wrongful discharge in violation of Ohio public policy.[1] *Id.* at 33-38.

Accordingly, the Court has federal question jurisdiction but notes that venue is improper in the United States District Court for the Southern District of Ohio, Eastern Division. Specifically, the plant where Wysong worked is located in Lawrence County. Southern District of Ohio Civ. R. 82.1(b) establishes that the United States District Court for the Southern District of Ohio, Western Division is the proper venue for this action. Neither party addressed this issue, and thus it appears that the parties have waived venue. *Catz v. Chalker*, 142 F.3d 279, (6th Cir. 1998).

Dow moves for summary judgment on all of Wysong's claims. The Court now turns to an examination of that motion.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[1] Wysong's memorandum in opposition to Dow's motion for summary judgment states that she does not oppose Dow's motion regarding her ERISA claim. (Doc. # 34 at 1) Hence, the Court grants Dow's motion for summary judgment on that claim. *Ferguson v. Leiter*, 220 F. Supp. 2d 875, 884 (N. D. OH 2002); *Soletro v. National Fed'n of Indep. Bus.*, 130 F. Supp. 2d 906, 911 (N.D. OH 2001).

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52). However, in ruling on a motion for summary judgment, "a district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

**DISCUSSION**

**I.      FMLA**

Wysong asserts that Dow violated the FMLA in two ways.  First, Wysong argues that Dow retaliated against her for taking FMLA leave in 2001 and 2002 by requesting to review her medical records.  (Doc. # 1 at ¶ 23).  Second, Wysong maintains that Dow forced her to "use up" her remaining leave entitlement under the FMLA in May 2003.  *Id.* at ¶ 24.  Dow, in response, states that the Court must dismiss Wysong's retaliation claim because she cannot establish her *prima facie* case.  (Doc. # 33 at 15). Dow argues further that Wysong's chronic neck condition not only warranted, but enabled, Dow to place Wysong on involuntary medical leave.  *Id.* at 20. Each argument and contention will be addressed in turn.

**A.      Retaliation**

No direct evidence exists to support Wysong's assertion of Dow's retaliation.[2] Consequently, she must first establish a *prima facie* case of retaliation utilizing indirect evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Skrjanc v. Great Lakes Power Services, Co.*, 272 F.3d 309, 315 (6th Cir. 2001)(adopting *McDonnell Douglas* framework for FMLA case relying on indirect evidence). If Wysong establishes her *prima facie case*, the burden shifts to Dow to present a legitimate, nondiscriminatory reason for Wysong's termination. *McDonnell Douglas*, 411 U.S. at 802-04. Should Dow do so, the burden

---

[2] Wysong's attempt to raise another claim to argue that direct evidence does exist is unsuccessful. Simply stated, Wysong alleges for the first time in her memorandum in opposition that Dow considered her 2001 and 2002 FMLA leave time as a "negative factor," in violation of 29 C.F.R.§ 825.220(c), and that consideration caused Dow to take an adverse employment action against her by imposing the restrictions and requiring her to take the FCE.  (Doc. # 34 at 5, 9, 11). Case law is clear, however, that Wysong cannot raise a new claim in response to a summary judgment motion.  *Tucker v. Union of Needletrades*, 407 F.3d 784, 788 (6th Cir. 2005).

then returns to Wysong to establish that Dow's articulated reason is in reality a pretext. *Id.* at 804-806.

### 1. Wysong's *prima facie* case

To establish a *prima facie* case of retaliation, Wysong must prove that: (1) she availed herself of a protected right under the FMLA by notifying Dow of her intent to take leave, (2) she was adversely affected by an employment decision, and (3) there is a causal connection between the protected activity and the adverse employment action. *McMillian v. Potter*, 130 Fed. Appx. 793, 796 (6th Cir. 2005); *Skrjanc*, 272 F.3d at 314. It is important to note that a plaintiff's burden in establishing a *prima facie* case is not intended to be an onerous one. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 870 (6th Cir. 2001).

The second and third elements are at issue here. Wysong maintains that Dow requested and reviewed her medial records in retaliation for her taking FMLA leave in 2001 and 2002. (Doc. # 1 at ¶ 23). Wysong continues that because of that review, Dow placed medical restrictions on her that lead to Dow placing her on leave, which eventually lead to Dow's termination of her employment. *Id.*; Doc. # 34 at 8-10. In response, Dow posits that its review of Wysong's medical records was not an adverse employment decision, and that its subsequent decisions to place her on medical leave in May 2003 and to terminate her employment in December 2003 were not related to Wysong's prior FMLA leave. (Doc. # 33 at 15). Dow's arguments prevail.

In order to establish the second element of a prima facie case of FMLA retaliation, Wysong must prove that Dow "intentionally discriminated against her in the form of an adverse employment action for having exercised an FMLA right." *Spurlock v. Peterbilt Motors Co.*,

*Inc.*, 58 Fed. Appx. 630, 631 (6th Cir. 2003).  An adverse employment action is a "materially

adverse change in the terms or conditions of . . . employment because of [the] employer's

conduct." *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002).  A "bruised

ego," or a "mere inconvenience or an alteration of job responsibilities" is not enough to

constitute an adverse employment action. *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 886

(6th Cir. 1996).  Examples of adverse employment actions include firing, failing to promote,

reassignment with significantly different responsibilities, a material loss of benefits, suspensions,

and other indices unique to a particular situation.  *Smith v. City of Salem*, 378 F.3d 566, 575-576

(6th Cir. 2004) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Given those parameters, the Court cannot conclude that Dow's review of Wysong's

medical records, which was done with Wysong's permission, constituted an adverse employment

action.  To begin, Wysong did not establish that Dow reviewed Wysong's medical records in

retaliation for her taking FMLA in 2001 and 2002.   Rather, Dow reviewed her records only after

Wysong complained of neck pain after a tough shift to Jones.  (Teter Dep. 23-26, 30-31, 40-42;

Jones Dep. 38-39, 46).  Next, Dow's review of Wysong's medical records, which was done with

her permission, was not an adverse change in the terms or conditions of her employment.  Hence,

the Court **GRANTS** Dow's motion for summary judgment on Wysong's FMLA retaliation

claim.  (Doc. # 33).

## B.    Involuntary Leave

Wysong next claims that Dow violated the FMLA by placing her on three days of FMLA

leave in May 2003 because she was not "incapacitated." (Doc. # 1 at ¶ 24; Doc. # 34 at 10).

Dow responds that because Wysong's neck problem was a "chronic serious health condition" it

10

was within its rights to place her on leave.  (Doc. # 33 at 20; Doc. # 35 at 7-8).

Case law is clear that Dow could place Wysong on FMLA leave.  *Moss v. Formosa Plastics Corp.*, 99 F. Supp. 2d 737, 741 (D. La. 2000); *Harvender v. Norton Co.*, 1997 U.S. Dist. LEXIS 21467, at * 21 (D. N.Y. 1997); *Love v. City of Dallas*, 1997 WL 278126, at * 6 (N.D. Tex. May 14, 1997).  Hence, the issue becomes whether Wysong was suffering from a "serious health condition" when Dow placed her on FMLA leave. (Doc. # 1 at ¶ ¶ 10-12).

The Secretary of Labor defined "serious health condition" in regulations promulgated under the FMLA.  The regulation that defines that term, which this Court finds to be a valid and reasonable exercise of the Secretary of Labor's authority, provides:

> (a) For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves:
> (2) Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
> (iii) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:
> (A) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;
> (B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
> (C) May cause episodic rather than a continuing period of incapacity (e.g. , asthma, diabetes, epilepsy, etc.).

29 C.F.R § 825.114.  Wysong conceded that her neck condition was a "chronic serious health condition."  (Doc. # 34 at 10).  Given the facts, there is no feasible way she could have denied it. For example, Wysong's treating physician, Dr. Jones ("Jones"), testified that she suffered from neck pain  before she began working for Dow in 2000.   (Jones Dep. 11-18).  Jones treated her before, during, and after her employment with Dow for her neck problems.  *Id.*  In addition,

Wysong sought and received treatment for her neck the day before her leave and during her

leave. *Id.* at 38-39; Jones Dep. Ex. 9; Doc. # 1 at ¶ 10.  Indeed, Golding performed trigger point

injections on Wysong's neck on May 14, 2003.  (Doc. # 1 at ¶ 10).  The next day, Wysong

visited physical therapist Susan Martin ("Martin") to help Wysong deal with her neck pain.

(Jones Dep. Ex. 10).  Wysong was to continue seeing Martin three times a week for three weeks.

*Id.*  On May 20, 2003, Wysong returned to Jones for more neck treatment.  (Jones Dep. 46; Jones

Dep. Ex. 1).

Instead, Wysong proffers that because she was able to work on May 14, 2003, and

therefore was not incapacitated, Dow violated the FMLA by placing her on leave.  (Doc. # 34 at

10).  This argument misses the mark, as the plain language of the regulation establishes that the

relevant inquiry is not whether Wysong could have worked on May 14, but whether her neck

condition was episodic and required treatment by periodic visits to a health care provider over an

extended period of time.  As set fourth above, each of these prerequisites is satisfied;

accordingly, the Court holds that Wysong's neck problems were a chronic serious health

condition that enabled Dow to place her on FMLA leave.  The Court **GRANTS** Dow's motion

for summary judgment on Wysong's involuntary leave FMLA claim.  (Doc. # 33).

## II.    OHIO REVISED CODE CHAPTER 4112: OHIO'S DISABILITY STATUTE

Wysong's second claim for relief involves Ohio's disability statute. (Doc. # 1 at ¶ 27-32).

Wysong contends that Dow regarded her as being disabled due to her chronic serious neck

condition and her "drug addiction."  *Id.*; Doc. # 34 at 12.  She continues that Dow discriminated

against her because of those perceived disabilities by: placing her on medical leave; requiring

her to take the FCE; refusing to allow her to take the FCE when she would not stop taking her

12

prescription medication; refusing to her allow to return to work; and terminating her employment. (Doc. # 1 at ¶ ¶ 11-16, 30).   Dow avers that it did not regard her as being disabled. (Doc. # 33 at 24, 26; Doc. # 35 at 9).

R.C. 4112.02 addresses unlawful discriminatory practices and provides that it "shall be an unlawful discriminatory practice . . .  for any employer, because of the . . . disability . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.02(A).

To establish a *prima facie* case of disability discrimination under R.C. Chapter 4112,  an employee must demonstrate: (1) that he or she was disabled; (2) that the employer took an adverse employment action against the employee, at least in part, because the employee was disabled; and (3) that the employee could safely and substantially perform the essential functions of the job in question despite his or her disability. *Hood v. Diamond Prod., Inc*., 658 N.E.2d 738 (Ohio 1996). An employee may satisfy the third element of the *prima facie* case by showing that he could have performed the essential functions of the job with a reasonable accommodation, if necessary. *Shaver v. Wolske & Blue*, 742 N.E.2d 164 (2000). Once an employee establishes a *prima facie* case of disability discrimination, "the burden then shifts to the employer to set forth some legitimate, nondiscriminatory reason for the action taken."  *Hood*, 74 Ohio St.3d at 302. If the employer does so, "then the employee . . . must demonstrate that the employer's stated reason was a pretext for impermissible discrimination." *Id.*

"Ohio's statute was modeled after the federal Americans with Disabilities Act ('ADA') and therefore, we look to the ADA and its interpretation by federal courts for guidance in

interpreting the Ohio statute." *Columbus Civ. Serv. Comm. v. McGlone,* 697 N.E.2d 204, 206-07 (Ohio 1998). Thus, in analyzing claims brought under R.C. Chapter 4112, the Court looks to federal case law interpreting the Americans with Disabilities Act ("ADA") for guidance. *Id.*

### A.     Wysong's *Prima Facie* Case

As used in Ohio Rev. Code § 4112.02, "'disability' means a physical impairment that substantially limits one or more major life activities ... or being regarded as having a physical or mental impairment." Ohio Rev. Code § 4112.01(A)(13). Wysong's claim rests on the "regarded as" language and asserts that Dow regarded her as being disabled in the major life activity of working. (Doc. # 1 at ¶ 30). Dow apparently concedes that Wysong's neck condition constituted a "physical impairment." (Doc. # 35 at 24).

In order to satisfy the "regarded as" definition of disabled, Wysong must show either that Dow mistakenly believes that: (1) Wysong has a physical impairment that substantially limits one or more major life activities, or (2) an actual, nonlimiting impairment substantially limits one or more major life activities. *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489 (1999); *see also Hart v. Columbus Dispatch/Dispatch Printing Co.*, 2002 Ohio 6963, at ¶ 30 (Ohio Ct. App. 10th Dist. 2002). "In both cases, it is necessary that a covered entity entertain misperceptions about the individual-it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton*, 527 U.S. at 489.

Regulations issued to provide guidance for terms found in the ADA define "substantially limits" to mean a person is

14

>    (i) unable to perform a major life activity that the average person in the general
>    population can perform; or (ii) significantly restricted as to the condition, manner or
>    duration under which an individual can perform a particular major life activity as
>    compared to the condition, manner, or duration under which the average person in the
>    general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)).[3]  The regulations further define "major life activities" as "functions

such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking,

breathing, learning, and working." 29 C.F.R. § 1630.2(I). The EEOC issued an interpretive

Guideline on these regulations that notes that list of major life activities is not exclusive, and

added sitting, standing, reaching and lifting as examples of major life activities. 29 C.F.R. §

1630, App. § 1630.2(I).

The United States Supreme Court has held the terms "substantially limits" and "major

life activity" must be "interpreted strictly to create a demanding standard for qualifying as

disabled." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002). An

impairment that only moderately or intermittently prevents an individual from performing major

life activities is not a substantial limitation under the ADA. *Mahon v. Crowell*, 295 F.3d 585

----

[3] The ADA fails to define "physical impairment," "substantially limits," and "major life activity," and no agency has been given authority to issue regulations interpreting the term "disability" in the ADA. *Sutton,* 527 U.S. at 479.  Nevertheless, the Equal Employment Opportunity Commission ("EEOC") has issued regulations defining the three elements of disability.  *See* 29 CFR §§ 1630.2(h)-(j) (2005).  Because the EEOC issued the regulations without authority, their persuasive authority is unclear. *Toyota Motor Mfg., KY Inc. v. Williams*, 534 U.S. 184, 194 (2002).  Regardless, the Court will utilize the EEOC's regulations as a source of guidance for deciphering those terms because both parties have cited the regulations in their briefs, thereby indicating that the parties believe that the regulations are reasonable and valid. *Id; see also Sutton*, 527 U.S. at 480; *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 563, at n.10 (1999); *Swanson v. Univ. of Cincinnati and University Hosp. Inc,* 268 F.3d 307, 314 (6th Cir. 2001) (accepting the EEOC's regulations as reasonable when both parties do the same).

(6th Cir. 2002).

The Sixth Circuit has "evaluated working as a major life activity under the ADA." *Dunaway v. Ford Motor Co.*, 2005 U.S. App. LEXIS 10089, at * * 18-20 (6th Cir. 2005) (citing *Mahon v. Crowell*, 295 F.3d 585, 590 (6th Cir. 2002) (stating "Because of the problems surrounding 'working,'. . . we shall treat it as suggested by the EEOC, as a residual category resorted to only when a complainant cannot show she or he is substantially impaired in any other, more concrete major life activity")); *Henderson v. Ardco, Inc*., 247 F.3d 645, 652 (6th Cir. 2001)(plaintiff presented genuine issue of fact on her claim she was regarded as disabled in the major life activity of working); *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001) (same).

The Supreme Court has set out the requirements for a plaintiff claiming the employer regarded him as disabled in the major life activity of working:

> To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton*, 527 U.S. at 492.  These requirements prompted the Sixth Circuit to comment on how difficult it is for a plaintiff to prevail on such a claim:

> Proving that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaches of the ADA. It is a question embedded almost entirely in the employer's subjective state of mind. Thus, proving the case becomes extraordinarily difficult. Not only must a plaintiff demonstrate that an employer thought he was disabled, he must also show that the employer thought that his disability would prevent him from performing a broad class of jobs. As it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations, the plaintiff's task

16

becomes even more difficult.

*Ross*, 237 F.3d at 709.

Further, the Court's focus in the "regarded as disabled" inquiry is not on Dow's belief about Wysong's ability to perform functions on the job, but rather the Dow's belief about "the effect of the impairment on the individual's daily life." *Dunaway*, 2005 U.S. App. LEXIS 10089, at * 16 (citing *Equal Opportunity Employment Comm'n v. Daimler Chrysler Corp.*, 111 Fed. Appx. 394, 399 (6th Cir. 2004)); *see also Williams*, 534 U.S. at 200-201.  In other words, a plaintiff must show the employer believed he was unable or significantly restricted in his ability to perform the activities at issue in his "daily life," not merely as part of the specific duties of the position for which he applied.  *Dunaway*, 2005 U.S. App. LEXIS 10089, at * 16.

With these parameters in mind, the Court proceeds to examine whether Dow regarded Wysong as disabled in the major life activity of working due to her chronic neck condition and "drug dependency."

### 1.    Chronic neck condition

The work restrictions Teter placed on Wysong prohibited her from lifting, pushing, pulling, or tugging anything of more than five (5) pounds.  (Miller Dep. at 39-40).  Miller stated that the restrictions essentially prevented Wysong from doing her job. (Miller Dep. at 38-39, 44-55).  Wysong's inability to perform her particular job does not equate to a substantial limitation in the major life activity of working, however.  *McKay v. Toyota Motor Mfg., U.S.A., Inc.*, 110 F.3d 369, 371 (6th Cir. 1997).  Instead, under *Sutton* and *Ross*, Wysong must show that Dow thought that her chronic neck condition prevented her from performing a broad class of jobs.

17

Wysong admitted in her deposition that no Dow employee told her that they thought that she was disabled.  (Wysong Dep. 123-25, 169).  Given this, Wysong is reduced to arguing that because Teter placed such "severe" work restrictions on her, he must have regarded her as being disabled.  (Doc. # 34 at 12-14).  Wysong offers no evidence for her argument, and the record displays the insufficiency of her assertion.   In particular, Teter testified at his deposition that he did not believe that Wysong was disabled, and he further testified that he did not have enough information to determine whether her chronic neck condition prevented her from performing any major life activities.  (Teter Dep. 70-72).  Teter stated that he imposed the restrictions to prevent her from injuring herself, and he never determined that Wysong required permanent restrictions. *Id.*  Wysong's first argument therefore fails.

Wysong next asserts that because Teter imposed the restrictions, he believed that her neck condition restricted her ability to perform many daily activities.  (Doc. # 34 at 14).  Once again, however, Wysong has failed to introduce any evidence that Dow ever considered whether she was able to lift more than five (5) pounds in her daily life outside of work.  *Dunaway*, 2005 U.S. App. LEXIS 10089, at * 16.  In fact, Teter's restrictions were for work only.  (Teter Dep. 30).

Consequently, the Court **GRANTS** Dow's motion for summary judgment on Wysong's Ohio Rev. Code Chapter 4112 chronic neck condition "regarded as" claim because she is unable to establish the first element of her *prima facie* case. (Doc. # 33).

      **2.**        **Drug Dependency**

Wysong advances a single argument relative to her drug dependency "regarded as" claim.[4]  Succinctly stated, Wysong argues that Teter mistakenly believed that she was addicted to her pain killers and that belief lead Teter to conclude that she would be unable to work any job. (Doc. # 34 at 15).  Dow counters that Teter's deposition testimony fails to support Wysong's contentions. (Doc. # 35 at 11).

Dow admits, for purposes of this motion, that Teter believed that Wysong was drug dependant.  (Doc. # 35 at 11).  Unfortunately for Wysong, Teter's testimony fails to establish that he regarded Wysong's "drug dependency" as substantially limiting her ability to work a broad class of jobs.  *Ross*, 237 F.3d at 709.  The following testimony from Teter's deposition proves instructive:

> Q:  Okay.  And what does that do - when your thinking about this type of behavior [drug dependency] in terms of medical restrictions, how does that affect what you may write as medical restrictions for such a person, for a person you believe is exhibiting such behavior?
>
> A:  Well, first of all, let me just say that drug dependency isn't the end of a person's life or work history.  We deal with them every day.  The restrictions, if I wrote them based upon the drug dependency behavior, would only be to keep that person safe when they're on the job.  In [Wysong's] case, once I learn this information, if I had written a restriction by this time, I would have been very happy that she had the restrictions and if she was off work.  And I'm assuming at this time, she was off work, that she, with this type of behavior, would not be safe to be at work because if she took too much of this pain medication, she would obviously not be able to function safely at work and she does work around heavy equipment and could injure herself.  But it would only be a temporary restriction.  I mean, the whole purpose of this is to get her back to work.  So the whole purpose of this, what we went through as we were dealing with her, was, number

---

[4] The Court is compelled to note that Wysong maintains that she is not addicted to pain killers. Wysong explains that Golding's "drug seeking" notation in Wysong's file was incorrect and that she simply asked Golding to return her to her previous pain medication. (Wysong Dep. 170-71).

> one, if she is dependent, she needs to be off the medication. Okay? And there's
> ways of doing that. There [are] treatment facilities. I mean, there [are] ways that
> the pain doctors could work with her and limit the amount of medication she
> takes. Secondly, that would then give us the ability to do a [FCE]. Because once
> this - her pain is no longer clouded by, perhaps, dependency and/or tolerance of
> this medication, then we could really get a good [FCE] and determine on a long
> term basis, can this person do her job. The whole purpose, again, is to get her
> back to work, not to keep her off work so that she loses her job, but to get her
> back to work.

(Teter Tr. 56-58).

No where does Teter state that he considered Wysong unable to perform a broad class of jobs because of her drug dependency. Rather, Teter clearly states that her drug addiction prevented her from doing her own job because it involved working with heavy equipment and she could injure herself. Furthermore, Teter became aware of Wysong's "drug seeking behavior" only after he issued the restrictions, and only then to the extent that she would not be able to take the FCE while she was taking the pills. (Teter Dep. 54, 104-107). The primary reason he put her on restrictions was because of her neck. *Id.* at 105.

Because Wysong failed to establish that Dow regarded her as unable to perform a wide variety of jobs due to her drug addiction, she also failed to establish the first element of her prima facie case. As a result, the Court **GRANTS** Dow's motion for summary judgment on Wysong's ADA drug dependency claim. (Doc. # 33).

## III. WRONGFUL DISCHARGE IN VIOLATION OF OHIO PUBLIC POLICY

Lastly, Wysong avers that Dow violated 42 U.S.C. § 12112(d)(4)(A) of the ADA by unlawfully requiring her to sign a blanket release of her medical records and then using that information to terminate her employment. (Doc. # 1 at ¶ 34; Doc. # 33 at 17-19). Unfortunately for Wysong, her public policy claims fail because the Court granted Dow's summary judgment

motion on her Ohio Rev. Code Chapter 4112 claims. According to the Sixth Circuit, public policy claims necessarily fail where the underlying statutory claims fail.  *Hausler v. GE*, 2005 U.S. App. LEXIS 10983 (6th Cir. 2005) (citing *Godfredson v. Hess & Clark, Inc*., 173 F.3d 365, 375 (6th Cir. 1999)).  Dow's motion for summary judgment on this claim is **GRANTED**. (Doc. # 33).

**CONCLUSION**

Dow's motion for summary judgment (Doc. # 33) is **GRANTED**. The Clerk is instructed to enter judgment in favor of Dow and against Wysong, and to terminate this case upon the docket records of the United States District Court for the Southern District of Ohio, Eastern Division, at Columbus.

**IT IS SO ORDERED.**

 

 

 

    **Gregory L. Frost**

**GREGORY L. FROST**

**UNITED STATES DISTRICT JUDGE**