RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0402p.06



FILED
JAMES BONINI
CLERK

2007 OCT -2 A 11: 23

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST DIV. COLUMBUS

FOR YOUR INFORMATION

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

KIMBERLY WYSONG,

*Plaintiff-Appellant,*

*v.*

No. 05-4197

THE DOW CHEMICAL COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 04-00007—Gregory L. Frost, District Judge.

Argued: November 28, 2006

Decided and Filed: October 1, 2007

Before: MERRITT and MOORE, Circuit Judges; COLLIER, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Gary A. Reeve, KENNEDY REEVE & KNOLL, Columbus, Ohio, for Appellant. James M. L. Ferber, LITTLER MENDELSON, Columbus, Ohio, for Appellee. **ON BRIEF:** Gary A. Reeve, KENNEDY REEVE & KNOLL, Columbus, Ohio, Aaron B. Maduff, MADUFF, MEDINA & MADUFF, Chicago, Illinois, for Appellant. James M. L. Ferber, Alison Day Hall, LITTLER MENDELSON, Columbus, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court, in which MERRITT, J., joined. COLLIER, D. J. (pp. 12-14), delivered a separate opinion concurring in part and dissenting in part.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge.    Plaintiff-Appellant Kimberly Wysong ("Wysong") sued Defendant-Appellee The Dow Chemical Company ("Dow") after Dow terminated her employment. Wysong alleged that Dow violated her rights under both the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and Ohio's anti-discrimination statute, OHIO REV. CODE § 4112.02, and also that Dow committed the state tort of wrongful discharge. The district

_____
[*] The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

1

court granted Dow's motion for summary judgment on all of Wysong's claims. Because the district court erred in its reasoning when it granted summary judgment to Dow on Wysong's FMLA claim, state anti-discrimination claim, and wrongful-discharge claim, we **REVERSE** the district court's judgment on these claims and **REMAND** to the district court for further proceedings in accordance with this opinion.

## I. BACKGROUND

Wysong worked at Dow's Hanging Rock facility as an Operating Technician. Joint Appendix ("J.A.") at 295 (Wysong Dep. at 50). Her position involved placing raw material into a laminating machine. J.A. at 299 (Wysong Dep. at 85). The raw material came into Wysong's work area on pallets from the warehouse, and a fork truck (sometimes operated by Wysong) was used to load the laminating machine. *Id.* The machine had moving parts, and the operator could sustain serious injury if all safety precautions were not followed. J.A. at 301-02 (Wysong Dep. at 87-88).

In 2001, Wysong took 464 hours of paid medical leave, and in 2002, she took 783.5 hours of such leave. J.A. at 345 (Wysong Dep. at 163). The leave taken during this period was for various reasons: chronic neck and groin pain, a hernia operation, mononucleosis, a hysterectomy, and caring for an ill child. J.A. at 210-13, 303 (Wysong Dep. at 93; Miller Dep. at 22-24, 29). Wysong always received her full pay during these leaves. J.A. at 334-35 (Wysong Dep. at 152-53).

On February 7, 2003, Production Leader Dwight Miller ("Miller") issued Wysong a "Letter of Concern" stating that she had exhausted all of her paid medical leave and that if she required additional leave before accruing further leave time, she would have to use her vacation time or take leave without pay. J.A. at 362-63, 365 (Wysong Dep. at 189-90; Ltr. of Concern). Wysong was required to notify Miller and to obtain his approval prior to any further absences, including planned medical procedures. J.A. at 239, 362-63, 365 (Miller Dep. at 74; Wysong Dep. at 189-90; Ltr. of Concern). On February 17, 2003, Miller issued Wysong a "Last Chance Letter" stating that Wysong had reported to work late without prior notification, and that Dow would terminate Wysong for any further performance failure. J.A. at 366 (Last Chance Ltr.). There were no further conflicts between the parties until May 2003.

Although it is unclear how the conversation started, on May 13, 2003, Wysong conveyed that her neck had been bothering her to Dow's plant nurse, Janet Jones ("Jones"). J.A. at 221 (Miller Dep. at 40). Wysong did not request any time off work in conjunction with this incident. J.A. at 223 (Miller Dep. at 42). Jones reported Wysong's complaint to Environmental Health and Safety Director, Troy Dehoff ("Dehoff"). Dehoff in turn notified Miller, who contacted Dr. Teter, Dow's Regional Medical Director. J.A. at 221-22 (Miller Dep. at 40-41).

After speaking with Miller, Dr. Teter placed Wysong on work restrictions: she was not to lift, push, pull, or tug anything over five pounds. J.A. at 219-20 (Miller Dep. at 38-39). According to Dr. Teter, the restrictions were issued out of his concern that Wysong was currently having "neck trouble," and that she had missed a lot of work in the past that "may have been due to [a] previous neck [problem]." J.A. at 251-54 (Teter Dep. at 40-41, 43-44). Miller determined that he could not assign Wysong to a job comporting with the work restrictions imposed by Dr. Teter, and Miller called Wysong to tell her not to come into work. J.A. at 225-26 (Miller Dep. at 44-45).

In a letter dated May 15, 2003, Miller informed Wysong that her "request" for FMLA leave was approved, and that because she had previously exhausted most of her FMLA leave for that leave year, she was eligible for only three more days of FMLA leave. J.A. at 372 (Ltr. Re: Certification of Med. Leave). Wysong brought the letter back to Human Resources Partner Tom Hutson ("Hutson") explaining that she had not "requested" any leave. J.A. at 127 (Hutson Dep. at 40).

Hutson reissued the letter, removing the language about her "request," but retaining the fact that Dow had put her on FMLA leave. *Id.*

Dow's Medical Review Board met to discuss Wysong's case. The Medical Review Board concluded and Wysong was informed that she would need to pass a functional capacity exam ("FCE") as a condition of returning to work. J.A. at 122-23, 227-29 (Hutson Dep. at 35-36; Miller Dep. at 46-48). An FCE is used to determine whether an employee is physically capable of performing a specific set of job duties. It consists of a series of tests, conducted by a physical or occupational therapist, and is intended to duplicate actions that the employee would perform at work. J.A. at 256-57 (Teter Dep. at 47-48).

On May 20, 2003, Wysong signed release forms authorizing Dow to obtain medical information from her treating physicians and providers. J.A. at 370-71 (Signed Authorization for Info. Forms). After reviewing Wysong's medical records (obtained as a result of the medical releases signed by Wysong), Dr. Teter found a comment by one of Wysong's treating physicians that Wysong was possibly exhibiting "drug-seeking behavior." J.A. at 262-63, 270-71, 352 (Teter Dep. at 54-55, 63-64; Wysong Dep. at 170). Dr. Teter took this to mean that Wysong was "drug depend[t]."[1] J.A. at 262-63, 270-71 (Teter Dep. at 54-55, 63-64).

Without consulting with any of Wysong's treating physicians, Dr. Teter decided that Wysong could not take the FCE unless she stopped taking all pain medication for two weeks. J.A. at 260-61 (Teter Dep. at 51, 53). In addition to being concerned about the safety risks associated with her taking narcotic drugs while working with the laminating machine and the fork truck, Dr. Teter believed that if Wysong took the FCE while taking these narcotics, the result of the test would be invalid. J.A. at 258, 265 (Teter Dep. at 49, 57). Wysong maintains that she refused to stop taking her pain medication for two weeks on the advice of one of her physicians. J.A. at 359 (Wysong Dep. at 177).

Because Wysong did not stop taking her pain medication, Dow refused to give her the FCE. J.A. at 373 (Ltr. Re: Extension of Med. Leave). On June 23, 2003, Dow placed Wysong on unpaid leave, effective July 7, 2003, "pending a release to work without restrictions" from both her physician and from Dow's medical department. *Id.* Wysong did not obtain any work releases, and on December 3, 2003, Dow terminated Wysong, basing the decision on its policy of terminating employees who are "on a medical leave of absence status for a continuous period of six months." J.A. at 360, 374 (Wysong Dep. at 178; Termination Notification Ltr.).

Wysong sued Dow in the district court alleging that Dow's conduct violated both the FMLA and Ohio's anti-discrimination statute, and also constituted wrongful discharge. The district court granted Dow summary judgment on all of Wysong's claims. This appeal followed.

## II. ANALYSIS

### A. Standard of Review

"We review de novo the district court's grant of summary judgment." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998). The district court's grant of summary judgment to Dow was proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

---

[1] Wysong maintains that she was not drug dependent, but rather, she had become ill on a newly prescribed drug and had asked the physician to take her off that drug and return her to a drug that she formerly took without serious side effects. J.A. at 352-53 (Wysong Dep. at 170-71).

material fact and that [Dow] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The district court must construe the evidence and draw all reasonable inferences in favor of Wysong, the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The crux of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## B. FMLA Claim: Interference

The FMLA entitles qualifying employees to take up to twelve weeks of unpaid leave, without fear of termination, when the leave is taken for, inter alia, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. §§ 2612(a)(1)(D), 2614(a)(1). A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). There are two recovery theories available under the FMLA: the interference theory, pursuant to 29 U.S.C. § 2615(a)(1), and the retaliation theory, pursuant to 29 U.S.C. § 2615(a)(2). *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).

The district court found that Wysong's complaint stated only a retaliation "claim" under the FMLA, and refused to consider her FMLA claim under the interference theory. J.A. at 97 (Op. at 8 n.2). In its decision granting summary judgment for Dow, the district court determined that Wysong did not make her prima facie case for retaliation. On appeal, Wysong argues that the district court erred in failing to analyze her FMLA claim under the interference theory.

Under our system of notice pleading a complaint need only provide "the defendant [with] fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (second alteration in original) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1959 (2007)). *See also* FED. R. CIV. P. Rule 8(a) (requiring only "a short and plain statement of the claim" at the complaint stage).

The district court's rejection of Wysong's interference-theory argument evidences an overly rigid approach which stands in conflict with our notice-pleading system. A defendant looking at Wysong's complaint would be on sufficient notice that she was broadly alleging violations under 29 U.S.C. § 2615, and that her FMLA claim could encompass either the interference theory, the retaliation theory, or both theories. J.A. at 10-11 (Compl. at 4-5). Contrary to the district court's characterization, Wysong has never alleged a new *claim* since filing her complaint. The claim has always been the same one: that Dow's actions violated the FMLA. Although we analyze an FMLA claim based on the interference theory differently from one based on the retaliation theory, notice pleading does not box plaintiffs into one theory or the other at the complaint stage of an FMLA action. Thus, Wysong did not forfeit the opportunity to present her FMLA claim under the interference theory.

Wysong's claim that she was terminated for taking FMLA leave is cognizable under the (a)(1)-interference theory. *Chandler v. Specialty Tires of Am. (Tenn.), Inc.*, 283 F.3d 818, 825 (6th Cir. 2002) ("[E]mployers are prohibited from interfering, restraining, or denying the exercise of or attempted exercise of any FMLA right. [] § 2615(a)(1). This prohibition includes retaliatory discharge for taking leave. *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir.

2001)").[2] We now turn to the applicable statutory provisions and analyze Wysong's claim under the interference theory.

The FMLA prohibits qualifying employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under th[e] [FMLA]." 29 U.S.C. § 2615(a)(1). To prevail under the interference theory, the employee must establish the following:

> (1) he is an "[e]ligible employee," 29 U.S.C. § 2611(2); (2) the defendant is an "[e]mployer," 29 U.S.C. § 2611(4); (3) the employee was entitled to leave under the FMLA, 29 U.S.C. § 2612(a)(1); (4) the employee gave the employer notice of his intention to take leave, 29 U.S.C. § 2612(e)(1); and (5) the employer denied the employee FMLA benefits to which he was entitled.

*Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). The employee must establish these elements by a preponderance of the evidence. *Sorrell v. Rinker Materials Corp.*, 395 F.3d 332, 335 (6th Cir. 2005). The parties agree that Wysong meets the first four elements of her case. The question of whether Dow denied her FMLA benefits to which she was entitled (the fifth element) is more complicated.

Quoting a case from the U.S. District Court for the Southern District of Ohio, Wysong argues that the fifth element of an interference-theory claim is that the employer "somehow used the leave against her and in an unlawful manner, as provided in either the statute *or* regulations." *Bradley v. Mary Rutan Hosp.*, 322 F. Supp. 2d 926, 940 (S.D. Ohio 2004). Although this language is different from the language used in *Cavin*, it does not conflict with *Cavin*, and, in fact, adds depth to the fifth element articulated in *Cavin*. Under 29 C.F.R. § 825.220(c) "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." We have earlier held that this negative-factor analysis is applicable in analyzing an interference claim. *See Brenneman v. Medcentral Health Sys.*, 366 F.3d 412, 422 (6th Cir. 2004); *Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 408 (6th Cir. 2003). If an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled. We, therefore, have no objection to rephrasing the fifth element of an interference claim as being that the employer has "somehow used the leave against her and in an unlawful manner, as provided in either the statute *or* regulations." *Bradley*, 322 F. Supp. 2d at 940.

Wysong's theory is that she was eventually terminated because of her taking FMLA leave in 2002. Wysong asserts that Dr. Teter wrote the work restrictions, in part, as a result of his knowledge that she had taken significant leave time in the past. The work restrictions prevented her from working, and she states that she could not comply with Dow's mandate that she go off all pain medications for two weeks before taking the FCE. Because she was not reporting to work, Dow terminated her. According to Wysong, this chain of events indicates that Dow used her 2002 FMLA leave time as a negative factor in its decision to terminate her. Wysong Br. at 20.

Dow acknowledges that Dr. Teter considered Wysong's previous absences when he issued the work restrictions and required Wysong to take the FCE without pain medications, but argues that he could consider her previous absences, because Dr. Teter did not write the restrictions *solely* on the basis of her missing work in 2002. Dow Br. at 26-27. This argument stands in direct conflict

---

[2] We note that, in this circuit, retaliatory discharge is also cognizable under the retaliation theory, 29 U.S.C. § 2615(a)(2). *See Arban v. West Publ'g Corp.*, 345 F.3d 390, 403 (6th Cir. 2003). We need not analyze Wysong's claim under this provision, because, on appeal, Wysong's arguments are all made under the (a)(1)-interference theory.

with the rule that "employers cannot use the taking of FMLA leave as *a negative factor* in employment actions." 29 C.F.R. § 825.220(c) (emphasis supplied). *See also Cavin*, 346 F.3d at 726 ("[A] termination based only in part on an absence covered by the FMLA, even in combination with other absences, may still violate the FMLA.") (internal quotation marks omitted).

Dow also argues that "[n]othing in the FMLA, its regulations, or the case law states that FMLA leave can never be considered by an employer for any purpose, or that it cannot be taken into consideration by medical personnel in making medical decisions." Dow Br. at 27. Further, Dow asserts that "[i]t would be illogical to presume that the FMLA makes it unlawful for a company physician to consider that a medical condition required an employee to miss work in determining what steps need to be taken to protect that employee from injury." *Id.* at 27-28.

These arguments suffer from the same malady: they are based on the false premise that Dr. Teter knew that Wysong missed work in 2002 based on a neck condition. Dr. Teter had no idea why Wysong missed work in 2002. J.A. at 251-54 (Teter Dep. at 40-41, 43-44). In fact, Wysong's 2002 absences were unrelated to her neck condition. J.A. at 210-13, 303 (Wysong Dep. at 93; Miller Dep. at 22-24, 29). Dow cannot prevail on the argument that Dr. Teter was permitted to consider FMLA-protected leave time in issuing severe work restrictions, because he had no knowledge as to why the earlier leave was taken. Accordingly, Dow's arguments are without merit.

We finally turn to the question of causation. The facts in this case are unique in that there are intervening events between the leave Wysong took in 2002 and her termination in 2003. Dr. Teter considered her 2002 FMLA (taken for reasons unrelated to her neck condition) when writing the work restrictions. Miller determined that Wysong could not perform a job meeting those restrictions and so told Wysong to stay home. Wysong was not permitted to return until she took the FCE which Wysong alleges she could not take based on the conditions imposed by Dow. As a result, Wysong could not return to work, which led to her termination. We agree with Wysong that the initial issuance of the severe restrictions set in motion an unbroken chain of events culminating in her termination. On these facts, we conclude that Wysong has met the fifth element of her interference claim.

## C. FMLA: Involuntary Leave

Wysong also made a claim under an "involuntary-leave theory," alleging that Dow violated her FMLA rights by forcing her to take her last three days of FMLA leave when she did not need to do so. Wysong argues that Dow forced her to take FMLA leave after she complained of neck pain in May 2003. The district court rejected Wysong's argument, stating that "[c]ase law is clear that Dow could place Wysong on FMLA leave," so long as Wysong's neck condition constituted a "serious health condition." J.A. at 100 (Op. at 11). Finding that Wysong did have a serious health condition, the district court granted summary judgment to Dow on this argument as well.[3] Although we ultimately agree with the district court's rejection of Wysong's involuntary-leave argument, we do so for different reasons.

An involuntary-leave claim is really a type of interference claim. An employee may have a claim under § 2615(a)(1) when an employer forces an employee to take FMLA leave when the employee does not have a "serious health condition" that precludes her from working. *See Hicks v. Leroy's Jewelers, Inc.*, No. 98-6596, 2000 WL 1033029, at *3-4 (6th Cir. July 17, 2000) (unpublished), *cert. denied*, 531 U.S. 1146 (2001); Megan E. Blomquist, *A Shield, Not a Sword:*

---

[3] The district court erred in making the determination as to whether Wysong was suffering from a "serious health condition." The parties dispute whether a "serious health condition" existed, and as this is a fact question, it was inappropriate for the district court to reach such a conclusion.

*Involuntary Leave Under the Family and Medical Leave Act*, 76 WASH. L. REV. 509, 529-31 (2001). However, the employee's claim ripens only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past. *See Edgar*, 443 F.3d at 507 (setting forth the elements of an interference claim).

Our decision in *Hicks* provides an excellent example as to when one might have a ripe, involuntary-leave claim. In *Hicks*, the plaintiff was pregnant and informed her employer that she wanted to take twelve weeks of FMLA leave after the baby was born so that she could care for the infant. *Hicks*, 2000 WL 1033029, at *1. A month before the baby was born, the plaintiff developed a kidney infection, causing her to miss work and spend one night in the hospital. She informed her employer that she would return to work the next day, but her employer instead forced her to take FMLA leave and would not allow her to return to work before the baby's birth. As a result of the involuntary leave, the plaintiff was unable to take the full twelve weeks of FMLA leave when the baby was born.

In a case such as *Hicks*, a plaintiff has a ripe § 2615(a)(1) claim—the employee may argue that she was later prevented from taking FMLA leave time to care for her child, because the employer had earlier forced her to take FMLA leave when she was suffering from a kidney infection. In order to recover, a plaintiff such as the one in *Hicks* would have to show that she was not suffering from a "serious health condition" that precluded her from working during the time for which the employer forced her to take FMLA leave, and thus, the employer was not entitled to require her to take the leave.[4]

Although we recognize that an employer who forces an employee to take leave may create a claim under the FMLA, Wysong does not have a viable claim under this theory. Wysong alleged that she was forced to take leave even though she did not have a "serious health condition" that precluded her from working. But this, in itself, does not create a ripe, involuntary-leave claim. Wysong would have had to allege also that she later requested FMLA leave, but that Dow refused, based on the fact that she had already used up her available FMLA leave. Wysong did not allege these facts, and thus, as a matter of law, she can not prevail on her FMLA claim based on this theory.

Wysong does not have a viable FMLA claim under the involuntary-leave theory pursuant to 29 U.S.C. § 2615(a)(1), because she cannot show that she was denied FMLA leave to which she was entitled as a result of Dow forcing her to take earlier leave when she did not have a "serious health condition" that precluded her from working.

## D. Ohio Disability-Discrimination Claim

### 1. Statutory & Regulatory Framework

Wysong also claimed that Dow's actions violated Ohio's statute prohibiting discrimination based on disability. Ohio law prohibits "any employer, because of the . . . disability . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." OHIO REV. CODE § 4112.02. "Disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities,

---

[4] In *Hicks*, we ultimately concluded that it was not necessary to remand even though there was a genuine issue of material fact as to whether the plaintiff's kidney infection was a "serious health condition" that precluded her from working. It was undisputed that, because of complications from childbirth, the plaintiff would not have been able to return to work after twelve weeks, even if the twelve weeks were calculated from the time the child was born rather than from the time the employer forced the plaintiff to take leave. We concluded that this undisputed fact precluded recovery under the FMLA, thus making remand unnecessary. *Hicks*, 2000 WL 1033029, at *4-5.

including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment." OHIO REV. CODE § 4112.01(A)(13).

Because "[t]he federal Americans with Disabilities Act ("ADA") is similar to the Ohio handicap discrimination law[,]. . . . [w]e can look to regulations and cases interpreting the federal Act for guidance in our interpretation of Ohio law." *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206-07 (Ohio 1998). Regulations issued to provide interpretive guidance for terms found in the ADA define "substantially limits" to mean a person is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). "Major life activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). However, an EEOC interpretive guideline states that this list is not meant to be exclusive, and added lifting as one example of another "major life activity." 29 C.F.R. § 1630.2, App. § 1630.2(i).[5]

Where the "major life activity" in issue is "working," the definition for "substantially limits" changes to:

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i).

### 2. Prima Facie Case

To make a prima facie case of disability discrimination under Ohio law, an employee must show: "(1) that he or she was handicapped, (2) that an adverse employment action was taken by an employer, at least in part, because the individual was handicapped, and (3) that the person, though handicapped, can safely and substantially perform the essential functions of the job in question."[6] *Hood v. Diamond Prods., Inc.*, 658 N.E.2d 738, 739 (Ohio 1996).

An employee may satisfy the first requirement of her prima facie case by showing that, although she was not disabled, she was "regarded as having a physical or mental impairment." OHIO

---

[5] "While Congress has not assigned authority to any federal agency to issue regulations defining the terms . . . 'substantially limits,' or 'major life activities,' the parties accept the EEOC's regulatory interpretation of these terms and this court assumes 29 C.F.R. § 1630.2[](i), and (j) are reasonable." *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 314 (6th Cir. 2001).

[6] In *Macy v. Hopkins County School Board of Education*, 484 F.3d 357 (6th Cir. 2007), we recently stated in the ADA-discrimination context that in order to establish a prima facie case, "a plaintiff's burden is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination." *Id.* at 364 (footnote omitted). We emphasized that there are "various context-dependent ways by which plaintiffs may establish a prima facie case, and not rigid requirements that all plaintiffs with similar claims must meet regardless of context." *Id.* at 365 (emphasis omitted).

REV. CODE § 4112.01(A)(13); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). "[A]n individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001). The Supreme Court has explained:

> There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton*, 527 U.S. at 489. It is undisputed that Dow regarded Wysong as having a chronic neck condition and drug dependency. Thus, the critical inquiry is whether Dow mistakenly regarded those impairments as substantially limiting a major life activity.

The district court granted summary judgment to Dow because it determined that Wysong did not meet the first prong of her prima facie case, that is, she did not demonstrate that Dow regarded her as disabled. J.A. at 109 (Op. at 20). Before examining each health condition, we initially note that "[u]nder the 'regarded as' prong of the ADA, membership in the protected class becomes a question of intent. . . . [and] that question—*i.e.*, the employer's motive—is one rarely susceptible to resolution at the summary judgment stage." *Ross*, 237 F.3d at 706 (internal quotation marks omitted). The case at bar is no exception.

### 3. Neck Condition

The "major life activity" in issue with respect to Wysong's neck condition is lifting.[7] *See Ross*, 237 F.3d at 709 ("[T]he standard mandates that [the defendant] must have regarded [the plaintiff] as significantly limited in his ability to lift . . . ."). Thus, the question is whether Wysong put forth evidence demonstrating that Dow regarded her as "[u]nable to [lift]" or regarded her as "[s]ignificantly restricted as to the condition, manner or duration under which" she could lift "as compared to the condition, manner, or duration under which the average person in the general population can [lift]." 29 C.F.R. § 1630.2(j)(1).

The key evidence put forth were the work restrictions imposed by Dr. Teter forbidding Wysong from lifting, pushing, pulling, or tugging more than five pounds. J.A. at 219-20 (Miller Dep. at 38-39). The district court rested its decision to grant summary judgment on two bases. First, the district court noted that "Teter stated that he imposed the restrictions to prevent her from injuring herself, and he never determined that Wysong required permanent restrictions." J.A. at 107 (Op. at 18). But this reasoning fails because a reasonable jury could infer, based on the severity of the restrictions imposed, that Dr. Teter regarded Wysong as substantially limited in her ability to lift.

Second, the district court found that "Wysong has failed to introduce any evidence that Dow ever considered whether she was able to lift more than five [] pounds in her daily life outside of work. In fact, Teter's restrictions were for work only." *Id.* (citation omitted). Of course the restrictions were for work only: Dr. Teter, as a Dow employee, had no authority to restrict Wysong's

---

[7] We disagree with Dow that we must analyze the "major life activity" in issue here as "working." "Lifting" in itself is a major life activity, and the restrictions that Dr. Teter placed upon Wysong specifically include lifting.

movement outside of the workplace. But a jury could make the obvious inference that, based on the work restrictions, Dr. Teter believed Wysong could not safely lift five pounds outside of work. Because the work restrictions could lead a reasonable jury to determine that Dow regarded Wysong as disabled, the district court erred in finding that Wysong did not meet the first prong of her prima facie case with respect to her neck condition.

### 4. Drug Dependence

The "major life activity" in issue with respect to Wysong's drug-dependence claim is "working." Thus, the question here is whether Dow regarded Wysong's "drug dependence" as "significantly restrict[ing] [her] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). The district court found that Wysong failed to make her prima facie case because "[n]o where does [Dr.] Teter state that he considered Wysong unable to perform a broad class of jobs because of her drug dependency." J.A. at 109 (Op. at 20). But such specific evidence is not required to make a prima facie showing of disability.

In *Henderson v. Ardco, Inc.*, 247 F.3d 645, 654 (6th Cir. 2001)), we reversed a grant of summary judgment for the defendant where the plaintiff "brought forward evidence that the defendant perceived there was no job for [the employee] at the [] plant." *Id.* This evidence "g[ave] an indication of the employer's perception about her suitability for a class of relevantly similar employment." *Id. See also Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 483-84 (6th Cir. 2005) (relying on *Henderson* in concluding that evidence that the employer perceived the plaintiff as unable to work in any relevant position at the defendants' place of business "constituted competent evidence of the employer's perception about the plaintiff's ability to perform the same broad class of work anywhere else.").

In the case at bar, Wysong has presented evidence that she was not permitted back to work at Dow until she was completely off all pain medications. Wysong received a letter from Dow stating that, due to her "condition" of drug dependency, she was unable to return to work "pending a release to work without restrictions from [her] Physician and the Dow Medical Department." J.A. at 373 (Ltr. Re: Extension of Med. Leave); see also J.A. at 137 (Hutson Dep. at 67). The letter sent by Dow, stating that she was unfit to return to work because of her "condition," is the type of evidence that "gives an indication of the employer's perception about her suitability for a class of relevantly similar employment." *Moorer*, 398 F.3d at 483-84. Further, Dow did not offer Wysong any other position within the Hanging Rock facility. A reasonable fact finder could conclude that, under the facts presented, Dow perceived Wysong as being unable to work anywhere at the plant, and thus, unable to perform the same broad class of work anywhere else. Because there was sufficient evidence put forth by Wysong that could lead a reasonable fact finder to conclude that Dow regarded her as disabled, we conclude that the district court erred in granting summary judgment to Dow with respect to Wysong's disability claim based on drug dependency.

### E. Wrongful-Discharge Claim

Wysong also brought a state public-policy claim, averring that Dow wrongfully discharged her by unlawfully requiring her to sign a blanket release of her medical records and then using the information obtained therefrom to terminate her employment. Wysong based this claim on a provision of the federal ADA which states:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A).

The district court granted summary judgment to Dow on the rationale that Wysong's public-policy claim was actually based on Ohio Revised Code § 4112.01 *et seq.*, and that because her claim under the state disability statute failed, the underlying public-policy claim must also fail. J.A. at 109-10 (Op. at 20-21) (citing *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 375 (6th Cir. 1999)).

Ohio's disability discrimination law has no mirror statute or regulation that covers the same area as 42 U.S.C. § 12112(d)(4)(A), i.e., no law covering unlawfully broad medical examinations or requests for information. Therefore, the district court erred in concluding that Wysong's common-law claim was subsumed by Ohio Revised Code § 4112.01 *et seq.* Accordingly, we remand this claim to the district court. In so doing, we express no opinion on the merits of the claim.

### III. CONCLUSION

Because the district court erred in its reasoning when it granted summary judgment to Dow on Wysong's FMLA claim, state anti-discrimination claim, and wrongful-discharge claim, we **REVERSE** the district court's judgment on these claims and **REMAND** to the district court for further proceedings in accordance with this opinion.

---

## CONCURRING IN PART, DISSENTING IN PART

---

CURTIS L. COLLIER, District Judge. For the most part, I concur in the well-reasoned and well-written majority opinion. However, I find I must respectfully dissent from one aspect of the decision, that is the portion of the majority opinion labeled II.D.3 where the issue of Wysong's disability claim is discussed. My dissent is driven by my understanding of the Supreme Court's decision in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*. I understand the import of that decision differently than does the majority.

In all other aspects of the majority opinion, I join in the opinion. Wysong, through no fault of her own, found herself in a position where she was not allowed to continue her employment with Dow while also meeting her medical needs. Dow's actions in this regard were not reasonable. It is unfortunate Dow, once it learned the complete facts, did not reinstate Wysong.

Where I part company with the majority opinion is where the opinion concludes Wysong had made out a prima facie case demonstrating Dow regarded her as being disabled in the major life activity of lifting due to her chronic neck condition.

On this issue I would affirm the district court. What the record shows is that Dow's company doctor restricted Wysong's ability to lift more than five pounds. Based upon this restriction, Dow concluded Wysong could not perform any work at Dow so she was told to not report to work. Although there is no evidence in the record Dow gave any thought as to how this inability to lift more than five pounds would affect Wysong in her daily life outside of work, it is reasonable, as the majority does, to infer that Dow considered Wysong unable to lift more than five pounds in her life outside of work. I agree with the majority that such an inference is permissible.

In my opinion, however, even given that inference, the question remains whether Wysong has demonstrated what the Supreme Court has indicated she must. The majority correctly states the test for a "regarded as disabled" case, i.e. the court must look "to the state of mind of the employer against whom [the plaintiff] makes a claim." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001). In *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, the Supreme Court emphasized, in addressing major life activities other than the ability to work, "the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." 534 U.S. 184, 200-01 (2002). I believe this same logic must be applied to a "regarded as disabled" case. Accordingly, this Court must consider whether, with this lifting restriction, Dow regarded Wysong as substantially limited in her daily life.

The district court relied on *Dunaway v. Ford Motor Co.*, 134 F. App'x 872 (6th Cir. 2005), in granting summary judgment on Wysong's "regarded as" claim. In *Dunaway*, an unpublished decision, the plaintiff claimed his prospective employer believed he was disabled (i.e. substantially limited in the major life activities of standing, climbing, squatting, kneeling, and lifting more than 30 pounds) and so refused to hire him. *Id.* at 877-78. The plaintiff offered evidence that the defendant's company doctor restricted his ability to lift. *Id.* The plaintiff also submitted testimony from the hiring decisionmaker, which purportedly demonstrated the belief the plaintiff was disabled. The decisionmaker, a Mr. Abbey, testified in a deposition, "it was clear to me he [the plaintiff] was unable to perform the essential functions [of the position] . . . based on the medical consultation." *Id.* at 878. A panel of the Sixth Circuit read this testimony to mean Mr. Abbey believed the plaintiff could not perform the job *under the restrictions imposed by the company doctor*. However, the panel found there had been no inquiry by defendant Ford into whether the plaintiff was restricted in

his daily life. *Id.* ("Dunaway did not present any evidence Abbey, Dr. Lin, or the other physicians ever asked him whether he could stand for prolonged periods, climb, squat, kneel, or lift more than 30 pounds, or required him to demonstrate his ability to perform those activities.").

Furthermore, in *Dunaway*, the Court found "the Court's focus in the regarded as disabled inquiry is not on the defendant's belief about the plaintiff's ability to perform functions on the job, but rather the defendant's belief about 'the effect of the impairment on the individual's daily life.'" *Id.* (citing *Equal Opportunity Employment Comm'n v. Daimler Chrysler Corp.*, 111 F. App'x 394, 399 (6th Cir. 2004) (unpublished)). In the context of a "regarded as" claim, the plaintiff should have satisfied the *Williams* inquiry and demonstrated "the employer believed he was unable or significantly restricted in his ability to perform the activities at issue in his 'daily life,' not merely as part of the specific duties of the position for which he applied." *Id.* Because the plaintiff offered no evidence anyone at Ford considered whether he was limited in his abilities outside of work, the panel approvingly quoted the district court: "The imposition of these restrictions for the purpose of employment in one position at Ford is not tantamount to a perception by Ford that plaintiff was unable to perform these restricted activities in his daily life." *Id.* Along these same lines, the Sixth Circuit affirmed the district court's finding "Dunaway did not create a genuine issue of fact as to whether Ford regarded him as disabled in those major life activities" since the plaintiff "ha[d] not presented the type of evidence necessary to support his argument Ford considered him substantially limited in his ability to perform the major life activities of prolonged standing, climbing, squatting, kneeling, and lifting more than 30 pounds in his daily life." *Id.*[1]

Although *Dunaway* is an unpublished opinion and is not binding, I do think it is specifically on point for this case. As in *Dunaway*, Wysong has offered absolutely no evidence anyone at Dow considered her substantially limited in her ability to lift outside of work. Even inferring that Dow believed Wysong could not lift more than five pounds outside of work, the question remains whether such a restriction, *in this case*, constitutes an "impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Williams*, 534 U.S. at 200-01. Not only would one have to infer that Dow considered the lifting restriction carried over into Wysong's life outside of work, but that the restriction severely restricted her from engaging in activities of central importance to most people's daily lives. On this record I do not think such an inference is possible. There is no evidence Dow gave any consideration as to how many times a day outside of work Wysong would be called upon to lift more than five pounds, under what circumstances she would be called upon to do so, what assistance she might have when such occasions arose, or how her inability to life more than five pounds would impact her.

My examination of the record in this case forces me to conclude that the District Court was correct on this issue. As the *Dunaway* court did, I would reject the idea that Dr. Teter's imposition of a lifting restriction on Wysong could permit a jury to infer he considered her lifting restriction to substantially limit her ability in her daily life activities outside of work. In fact, such an idea is contradicted by Dr. Teter's testimony. The majority itself cites the district court, which quoted Dr. Teter as stating, "he imposed the [lifting] restrictions to prevent [Wysong] from injuring herself, and be never determined that Wysong required permanent restrictions." (*See* Pt. II.D.3, *supra*, citing J.A.

---

[1] *See also Cotter v. Ajilon Servs.*, 287 F.3d 593, 600-01 (6th Cir. 2002) (contrasting *Ross v. Campbell Soup Co.*, 237 F.3d 701 (6th Cir. 2001), with the facts at issue; in *Ross*, "there was substantial evidence that the plaintiff's medical status significantly influenced his employer's decision to terminate him" including a memo labeling the plaintiff as a "back case"; in *Cotter*, the evidence was "insubstantial" and in fact, the defendant "attempted to market Cotter to a client . . . a fact which mitigates against a finding that Ajilon regarded him as substantially limited in working . . ."; *Thompson v. Potter*, No. C2-04-291, 2006 WL 783395, *12 (S.D. Ohio Mar. 27, 2006) (defendant-employer viewed the plaintiff "through the lens of the permanent work restrictions provided by Dr. Jeu, not through any lens of 'myth, fear, and stereotype,'" which are the concerns addressed by 29 U.S.C. § 705(20)(B)(iii)) (citing *Mahon v. Crowell*, 295 F.3d 585, 585 (6th Cir.2002)).

at 107 (Op. at 18)). *Williams* requires the disability to be long-term or permanent. 534 U.S. at 185, 198. In a "regarded as disabled" case, then, the employer must regard or think the disability is long-term or permanent. Here, there is no such evidence in the record.

Moreover, I find it troubling that, if simply an employer's work restriction raises the inference that the employer regarded the employee as disabled, then all "regarded as" cases would necessarily go to the jury, notwithstanding the absence of evidence the employer gave any thought to how the work restriction impacted the employee's daily life activities. This to me seems to run completely counter to the teachings of *Williams*.

In sum, I believe, on this record, Wysong has failed to make a prima facie case that she is disabled under Ohio law or that Dow regarded her as disabled. Wysong failed to demonstrate her lifting restriction extended to "activities of central importance to most people's daily lives" and outside of her employment. The crux of the matter is that Wysong is not trying to show she was "regarded as disabled" from working, but from lifting, and as *Dunaway* suggests, the test to be applied to this major life activity is stringent.

Therefore, on the question of a lifting disability due to her neck pain, I would affirm the district court.